UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| IN RE: | . | Chapter 11 |
| | . | |
| | . | Case No. 09-15378 (REG) |
| | . | |
| SIGNATURE APPAREL GROUP, | . | |
| LLC, | . | |
| | . | |
| Debtor. | . | |
| _____ | . | |
| SIGNATURE APPAREL GROUP, | . | Adv. Case No. 11-02800 (REG) |
| LLC, | . | |
| | . | |
| Plaintiff, | . | |
| | . | |
| vs. | . | |
| | . | One Bowling Green |
| STUDIO IP HOLDINGS, et | . | New York, New York 10004 |
| al., | . | |
| | . | |
| Defendant. | . | Tuesday, November 4, 2014 |
| . . . . . . . . . . . . . . | . | 2 p.m. |

TRANSCRIPT OF MOTION FILED BY THE RESPONSIBLE PERSON
FOR ENTRY OF AN ORDER AUTHORIZING AND APPROVING
SETTLEMENT AGREEMENT AND RELEASES WITH DEFENDANTS,
JOSEPH LAURITA AND ADELINE LAURITA; DAUBERT MOTION FILED
BY THE DEFENDANTS TO EXCLUDE THE REPORT AND ANY
TESTIMONY OF PLAINTIFF'S EXPERT WITNESS; MOTION FILED
BY THE PLAINTIFF FOR SUMMARY JUDGMENT; MOTION FILED
BY ICONIX BRAND GROUP, INC. AND STUDIO IP
HOLDINGS, LLC FOR SUMMARY JUDGMENT
BEFORE THE HONORABLE ROBERT E. GROSSMAN
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:   (Continued)

ECRO:                   J. Chien

Transcription Company:   Ad Hoc Transcription, LLC
                         241 Sussex Avenue
                         Newton, New Jersey 07860
                         (888) 516-5553
                         www.adhoctranscription.com

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

APPEARANCES:

For the Responsible
Party:                          Jonathan T. Koevary, Esq.
                                Kyle C. Bisceglie, Esq.
                                Ellen V. Holloman, Esq.
                                OLSHAN FROME WOLOSKY, LLP
                                Park Avenue Tower
                                65 East 55th Street
                                New York, New York 10022

For Christopher Laurita
and New Star Group:             Mitchell B. Seidman, Esq.
                                Andrew Pincus, Esq.
                                Jeffrey Kramer, Esq.
                                SEIDMAN & PINCUS, LLC
                                777 Terrace Ave, Suite 501
                                Hasbrouck Heights, New Jersey 07604

For Studio IP Holdings
and Iconix Brand Group:         Harris H. Cogan, Esq.
                                Michael Z. Brown stein, Esq.
                                Andrew T. Hambelton, Esq.
                                BLANK ROME, LLP
                                The Chrysler Building
                                405 Lexington Avenue
                                New York, New York 10174


For Joseph and Adeline
Laurita:                        Tracy L. Klestadt, Esq.
                                KLESTADT & WINTERS, LLP
                                570 Seventh Avenue, 17th Floor
                                New York, New York 10018

3

1       NEW YORK, NEW YORK, THURSDAY, NOVEMBER 4, 2014, 2 P.M.

2               THE CLERK:  Case Number 09-15378, Signature Apparel

3   Group.

4               MS. SCHWARTZ:  Your Honor, the U.S. Trustee doesn't

5   have a position with respect to this adversary.  May I please

6   be excused?

7               THE COURT:  Yes.  Thank you.

8               MS. SCHWARTZ:  Thank you.

9               THE COURT:  Thank you for your help today.

10              MS. SCHWARTZ:  Thank you, Your Honor.

11              THE COURT:  Hold it.  Hold it, hold it, hold it.

12  Okay.  Let's get appearances.

13              MR. KOEVARY:  Good morning, Your Honor.  Jonathan

14  Koevary, Olshan, Frome, Wolosky for the responsible person.

15  With me, Your Honor, are my colleagues, Kyle Bisceglie and

16  Ellen Holloman also from Olshan, Frome, Wolosky.

17              MS. HOLLOMAN:  Good morning, Your Honor.

18              THE COURT:  Good morning.

19              MR. BISCEGLIE:  Good morning, Your Honor.

20              MR. COGAN:  Harris Cogan of Blank Rome for the Iconix

21  defendant, Studio IP Holdings and Iconix Brand Group.  With me

22  are Andrew Hambelton and Michael Brownstein.

23              MR. SEIDMAN:  Good morning, Judge.  Mitchell Seidman

24  for Christopher Laurita and the New Star Group from Seidman &

25  Pincus.  With me this morning are Andrew Pincus and Jeffrey

4

1 Kramer.

2        MR. KLESTADT:  Good morning, Your Honor.  Tracy

3 Klestadt of Klestadt & Winters for Joseph and Adeline Laurita.

4        MR. KOEVARY:  Your Honor, we have several matters on

5 for this afternoon, starting with we have a 9019 motion.  We

6 have, Your Honor, a pretrial conference.  Then we have the main

7 event which is a summary judgment motion, dueling summary

8 judgment motions and a <u>Daubert</u> motion to go with that.

9        My suggestion, Your Honor, is to go in that order --

10 proceed in that order.

11        THE COURT:  Which order?

12        MR. KOEVARY:  The order -- beginning with the 9019

13 and going to the pretrial but we're happy to go in whatever

14 order Your Honor suggests.

15        THE COURT:  There are objections to the 9019, aren't

16 there?

17        MR. KOEVARY:  There is an objection, Your Honor, to

18 the 9019.  I would call it more of a clarification request than

19 an objection.  There's no -- it's brought by the Iconix

20 defendants.  It's not brought on any reasonableness grounds.

21 They had asked us --

22        THE COURT:  I'm not asking for an argument about it.

23 I'm just asking is there an objection.

24        MR. KOEVARY:  Yes, Your Honor.  There is an

25 objection.

1        THE COURT:  Okay.  So do you want to do that or are

2  the other aspects of the case -- do we need to do those before

3  we do the 9019?

4        MR. KOEVARY:  I really don't believe so, Your Honor.

5        THE COURT:  Anybody have a view?  Anybody care?

6  Okay.  Do the 9019.

7        MR. KOEVARY:  Okay.  Your Honor, the 9019 is a

8  settlement with husband and wife defendants to two litigations;

9  one of the adversary proceedings is what's on for -- the

10  summary judgment motion on for today.  The other adversary

11  proceeding is not on for today but it's on for trial still with

12  other defendants later this month.

13        The settlement calls for to receive a million dollars

14  from these two individuals over a two-year period.  It is

15  secured, Your Honor, by a confession of judgment to be held in

16  escrow --

17        THE COURT:  The argument is you're settling one of

18  the cases for nothing.

19        MR. KOEVARY:  No, Your Honor.  I don't read that --

20        THE COURT:  That may not be true but that's the

21  argument.

22        MR. KOEVARY:  That's not how we read it.  We read the

23  opportunity -- we ready the objection as asking how are we

24  apportioning the settlement.

25        THE COURT:  And, yeah, I'm -- unless I tell you

6

```
 1  otherwise, assume I read the stuff.  The objection -- you may
 2  not agree with it and these guys can speak to it, the way it
 3  reads to me is you're settling multiple cases for a million
 4  dollars which has been paid over time.  I'm not sure there's a
 5  problem with the million dollars.  There's a problem because of
 6  an indemnification possibility that a certain amount of that
 7  money should be allocated in some form other than you're
 8  allocating it because the argument is in the case where they're
 9  getting zero or you're allocating zero, there are
10  indemnifications so that if money were paid, the remaining
11  defendants of which some of these guys represent, would be on
12  the hook for less.  That's the argument.  So just tell me why
13  they're wrong.
14          MR. KOEVARY:  Your Honor, I -- Your Honor, when we've
15  -- let's step back.  We've apportioned this, Your Honor, based
16  upon what we've learned in discovery and what we've essentially
17  learned through discovery is that when it comes to the case
18  that's on for today, the Iconix transaction, that's not really
19  a role as we understood -- we understood -- as we understand
20  it, Joseph and Adeline Laurita didn't really have a role in
21  that case.  What discovery has shown us --
22          THE COURT:  Are they named in that case?
23          MR. KOEVARY:  They are named in that case, Your
24  Honor.
25          THE COURT:  Who named them?
```

7

1

2        MR. KOEVARY:  Your Honor, the responsible person

3 named them but --

4        THE COURT:  That's you.

5        MR. KOEVARY:  Yes, Your Honor, that's our client.

6 And our view and understanding of the case and the basis for

7 our apportionment is on several grounds and on one of the

8 grounds for the -- why the apportionment is we looked to see

9 what actions were done by whom and the actions that we saw that

10 were done by the alleged -- the allegations, what we saw are

11 that Joseph and Adeline Laurita were, as we see it,

12 coconspirators but not the primary beneficiaries of the co-

13 conspiracy, and they really weren't involved as far as we could

14 tell with the Iconix transaction --

15        THE COURT:  They had -- your view is they have no

16 liability under that case.

17        MR. KOEVARY:  They have no liability under that case.

18 Yes, Your Honor.

19        THE COURT:  All right.

20        MR. KOEVARY:  They have liability we believe, joint

21 and several liability under the other case.

22        THE COURT:  I'm just asking.  So the reason you

23 apportioned this is you feel in the case the parties are

24 objecting that you're not giving any credit to, these two

25 defendants have no liability.

8

1          MR. KOEVARY:  Correct, Your Honor.

2          THE COURT:  So you could basically just drop them

3  from the litigation if you wanted.

4          MR. KOEVARY:  Absolutely, Your Honor, and that's what

5  -- that's exactly what this does because the 9019 --

6          THE COURT:  This is a settlement.  You're not

7  dropping them.  You're settling it.  There's a difference.

8          MR. KOEVARY:  We're settling but we're going to --

9  yes, we're settling both but we're going to dismiss the case.

10          THE COURT:  Okay.

11          MR. KOEVARY:  Vis-a-vis the settling defendants.

12          THE COURT:  You get a million dollars and it's all

13  being applied to the other case where -- period.

14          MR. KOEVARY:  Yes, Your Honor.

15          THE COURT:  Okay.  Let me hear -- that's their --

16  that's the sole objection.

17          MR. COGAN:  Thank you, Your Honor.  Harris Cogan on

18  behalf of the Iconix defendants.  Your Honor stated our

19  objection correctly.

20          What's happening here is there is an allocation of

21  zero to a claim of joint tortfeasors where the claimed damages

22  is $18 million.  They are claiming --

23          THE COURT:  Well, now they're claiming that those two

24  folks who are settling have no liability in this case.

25          MR. COGAN:  And I find that rather surprising that

9

1  after four years of litigation they can come in and say that

2  the principal of the company in which they allege all types of

3  wrongdoing, in which they have come to court time and time

4  again screaming about wrongdoing suddenly has no -- has not

5  been involved in any way whatsoever simply by a statement, a

6  conclusory statement in an affidavit that they moved to

7  California after the facts and therefore they're not as liable.

8  I submit Your Honor --

9          THE COURT:  He's the plaintiff.  He says he doesn't

10  have a case against these two.

11          MR. COGAN:  Well, first of all, there's only a case

12  against Joseph Laurita.  Adeline Laurita is not a party to --

13  but it's -- for somebody to get up and say I have wasted this

14  Court's time in years of litigation and have suddenly concluded

15  that I have no case, you need more than that.  They came in and

16  they said we have a million-dollar settlement of the two cases.

17  That's not what they said on their motion.

18          In other words, on their motion, they came in and

19  said we want to settle a million dollars -- for a million

20  dollars; we're settling both cases.  It was only when we

21  objected and said you've got to apportion because under General

22  Obligations Llaw 15-108, the failure to apportion prejudiced us

23  significantly.  So we said you've got to apportion.

24          What they decided to do is say in reply we have no

25  case?  I appreciate the fact that they are now conceding --

1          THE COURT:  Well, but part of the elements of this

2  case are joint tortfeasors, correct?

3          MR. COGAN:  Correct.

4          THE COURT:  So it's hard to have a joint tortfeasor

5  if you only have one.

6          MR. COGAN:  Well, they are alleging and have alleged

7  that every defendant has been involved in this joint conspiracy

8  to defraud.  Apparently, they now believe that the principal of

9  the debtor company has not been involved whatsoever.  I think

10  they have to present more to this Court to simply say we are

11  settling for zero.

12          THE COURT:  Again, I'm not -- I mean, this is a 9019.

13  We went through this before.  Now, there could be

14  ramifications.  I guess the argument being presented to the

15  Court is not that we're settling a claim because we can't prove

16  it or this, that, or the other.  The argument is there is no

17  claim, that they've shown that these two -- one person I guess,

18  relative to this case had no role, has no liability.

19          That may have consequences in the rest of the

20  lawsuit, I don't know --

21          MR. COGAN:  No, I think --

22          THE COURT:  -- but I think that's the plaintiff's

23  trustee's decision that he does not believe that he can

24  adequately prove any liability to this person in this case.

25  That's his decision.  I don't have any problem with that.

1          MR. COGAN:  Well, I appreciate the concession by the

2     plaintiff that he has concluded that there was no conspiracy by

3     Mr. Laurita --

4          THE COURT:  Well, but I -- you make your argument.

5     I'm sure he'll --

6          MR. COGAN:  That's his concession.

7          THE COURT:  All right.

8          MR. COGAN:  But on a 9019 there is some standard that

9     has to be met, and zero dollars is not meeting that standard --

10         THE COURT:  You mean the estate is getting a million

11    dollars.

12         MR. COGAN:  The estate is getting a million dollars

13    for settlement of a claim for misappropriation of $7.8 million.

14    I don't contest that settlement.  I'm not a party to that

15    lawsuit either --

16         THE COURT:  No, they're getting a settlement on 18

17    million.

18         MR. COGAN:  No, they're getting a settlement --

19         THE COURT:  On both cases.

20         MR. COGAN:  On both cases.

21         THE COURT:  And didn't you say your case is 18

22    million?

23         MR. COGAN:  Yes.  The case against us they are

24    claiming 18 million of damages.  The claim -- the case of

25    misappropriation by the Lauritas in which Iconix is not

12

1 involved whatsoever is a claim of 7.8 million.  They're now

2 claiming that they will settle one case for a million dollars.

3     THE COURT:  No, they're settling both cases --

4     MR. COGAN:  But giving --

5     THE COURT:  -- for a million dollars.

6     MR. COGAN:  -- zero -- there's -- and I submit a zero

7 settlement is not a settlement.  If they want to say that they

8 are discontinuing with prejudice, if they want to say that they

9 have determined that there is no wrongdoing on the part of

10 Joseph Laurita, that's fine but they can't settle the case for

11 a million dollars.

12     THE COURT:  What if he allocated a thousand dollars?

13     MR. COGAN:  Well, then I think this Court would then

14 have to look and say is a thousand dollars realistic, does it

15 meet the standard -- and a thousand dollars for an eighteen-

16 million-dollar claim, I mean we believe this eighteen-million-

17 dollar claim has no merit but I believe a thousand dollars

18 doesn't meet that standard.  They have to show why they believe

19 that it's in the interest of the estate to settle for a

20 thousand dollars.

21     THE COURT:  Why wouldn't you just discontinue it,

22 take the whole million, put it on the other place and just

23 discontinue it.  Discontinue this case.

24     MR. KOEVARY:  Your Honor, I think that's something we

25 could do vis-a-vis -- I mean, I think --

13

1        THE COURT:  Well, you'd eliminate this objection

2   completely.

3        MR. COGAN:  Well, I have a problem with a continuance

4   with prejudice to some extent and that is because if there is a

5   finding of joint tortfeasor relationship which we don't believe

6   will happen here under GOL 15-108, there has to be a

7   determination of the fault of the various parties including a

8   settling defendant because what happens in a joint tortfeasor

9   situation under the General Obligations Law 15-108 is that if

10  you settle with one of the defendants and there's a fine thing

11  of a conspiracy, then what you have to do is credit the greater

12  of the culpability or the amount of the settlement.

13       THE COURT:  But they've determined there is no

14  culpability.

15       MR. COGAN:  Well, their determination I don't think

16  is binding on the Court --

17       THE COURT:  Here's a question.  So if I approve the

18  settlement, Mr. Klestadt's client, correct?

19       MR. KLESTADT:  Yes, Your Honor.

20       THE COURT:  If I approve the settlement and we go to

21  trial and at trial it's shown that they were in fact joint

22  tortfeasors but there's a release so nobody can go after them,

23  is there a consequence to that?

24       MR. COGAN:  Yes.  Let's take hypotheticals.

25  Obviously, again we say there will be no proof, no

14

 1  establishment of liability.  Let's assume that this Court finds

 2  a million-dollar damages on all of the joint tortfeasors.  Now,

 3  there's been a settlement already with the Azrak defendants for

 4  $400,000.  And let's assume that they apportion $500,000 to

 5  this particular settlement or they do zero.  Let's assume they

 6  do zero for this settlement but the Court determines that

 7  Joseph Laurita was fifty-percent liable for this alleged

 8  conspiracy.  That million dollars would have to be reduced by

 9  his fifty-percent interest, 500,000 as well as the 400,000.

10          THE COURT:  So I'm still free even after the

11  settlement to find that these folks have liability; it's just

12  that they've been -- that in your case but you just can't

13  collect against them.  So you would get a -- in your mind, you

14  would get a credit if there were a way one could apportion the

15  liability.

16          MR. COGAN:  That is correct, but they have to be

17  defendants in the case.

18          THE COURT:  Do you agree with that?

19          MR. KOEVARY:  I think maybe that's right, Your Honor.

20  I have to give that some thought but I think that's not an

21  issue for the 9019 motion.  That's not an issue for -- is this

22  today for the best interest of the estate.

23          THE COURT:  I kind of know what that means.  I'm

24  asking a specific question.  Mr. Cogan just made an argument

25  that even I grant the 9019 and the -- Mr. Klestadt's clients

15

1  are released from any financial liability, they are still part

2  of the lawsuit because they've never been -- you've never

3  discontinued it as to them, or even if they're not part of the

4  lawsuit, take it that way, they're not part of the lawsuit, but

5  at trial it's established they did have a role and that role

6  was a certain percentage, and therefore, all you could collect

7  against the other defendants is a net number.

8          Do you agree with that?

9          MR. BISCEGLIE:  Your Honor, I'm just -- for

10 expediency.  I believe that it would only apply to the tort

11 claim. So, if there's a breach of claim against Iconix, there

12 wouldn't be a reduction under 15 --

13         THE COURT:  But that's a question of law.  You

14 believe it conceptually.  Even though the parties are released,

15 there's still an allocation of liability that can affect what

16 the remaining defendants would have to pay.

17         MR. BISCEGLIE:  Correct.  Under the tort theories,

18 Your Honor, I mean that was a correct statement of law.

19         THE COURT:  All right.

20         MR. BISCEGLIE:  Under 15-108 and can actually be the

21 beneficiary of that.   If we're settling for the wrong amount,

22 they would still have a reduction in their judgment by

23 percentage of liability that Joe Laurita had because it's the

24 greater of, the percentage of liability or the amount paid.

25         MR. COGAN:  And that is why the allocation is

16

1  important because it's the greater of the liability --

2  percentage liability or the amount paid.  So, in a situation

3  where for argument's sake there is a million dollars of damages

4  and let's assume that Mr. Laurita is found to be ten percent

5  liable but they settle for a hundred -- $200,000 as allocated,

6  we would get credit for $200,000 in that situation.

7          THE COURT:  That frankly is too esoteric for me.

8          MR. COGAN:  Well, that's why I believe that you can't

9  simply allocate zero.

10          THE COURT:  The trustee is -- believes that there's

11  zero value to this.  That's why he's settling.  If it's shown

12  that zero is a million, then the trustee would have given away

13  a million dollars for nothing and that would be his business

14  judgment.

15          And, again, whether you would do it or someone else

16  would do it is not the question.  The question is does this

17  meet the reasonableness -- the lowest standard for the estate.

18  This is an interesting one because there are multiple

19  litigations so it's not necessarily beneficial to a particular

20  -- a case within this estate but it does meet to me a minimal

21  standard.

22          Now, I think that as the case goes on, if at trial

23  it's shown -- you know, there's no hindsight but if it's shown

24  that what was settled for zero was worth millions of dollars,

25  you could question -- I guess question the trustee but I think

1  with that predicate that your clients -- because if no

2  liability were shown, then settling for zero doesn't affect you

3  at all.  If they had no liability as they argue, then whether

4  he settled for zero doesn't matter.  And you still get an

5  opportunity to apportion liability and get a credit against

6  whatever you may -- your client may owe and that the trustee

7  would not be able to collect, he's walking away from it.

8         So, if he wants to allocate zero but that -- I don't

9  -- based on this argument, I think I'm hard-pressed to -- I

10  accept your objection but I think this argument goes a long way

11  for me to understand that the trustee is moving ahead with a

12  case against other folks as joint tortfeasors, conspiracy, all

13  those other things and yet taking the position as you say that

14  the party who ran the company -- I'm not sure he ran it -- was

15  the major -- a major player within the company has no

16  liability.

17         Fine, that's their position.

18         MR. COGAN:  I understand, Your Honor.

19         THE COURT:  So I think with that being said, I think

20  yours was the only objection to this.

21         MR. COGAN:  That's correct.

22         THE COURT:  As long as the trustee wants to go ahead,

23  I'll grant that motion.

24         MR. KOEVARY:  Thank you, Your Honor.

25         MR. COGAN:  Thank you, Your Honor.

18

1          THE COURT:  All right.  I mean, the record is pretty

2     clear now.

3          MR. KOEVARY:  If we haven't already, we'll submit an

4     order.

5          MR. COGAN:  I would like the order to reflect that

6     the right of apportionment remains.

7          THE COURT:  Well, you're going to have a real bear

8     trying to write this but I understand that, and that's why I

9     made a record today but I'm not going to let you go too far in

10    the order but you can reference the argument that was made in

11    court and the representations of the trustee, of the interested

12    party.

13         MR. COGAN:  All I would say I think is that --

14         THE COURT:  He agreed --

15         MR. COGAN:  -- our rights under GOL 15-108 remain

16    with respect to --

17         THE COURT:  Their position was they have a difference

18    of whether it applies to contract or torts but as a statement

19    of law, the responsible party's position was they agree with

20    you.  So you shouldn't have any trouble putting this in.

21         MR. COGAN:  Thank you, Your Honor.

22         MR. KOEVARY:  We'll work with them.  I think --

23         THE COURT:  Show Mr. -- obviously show all the

24    relevant parties the order before you submit it.

25         MR. KOEVARY:  Thank you, Your Honor.

1          THE COURT:  The Court will grant that motion.

2          MR. KOEVARY:  Thank you, Your Honor.

3          Your Honor, just before summary judgment, the other

4  matter which is with the related parties is the pretrial

5  conference -- the initial pretrial conference on a four-

6  hundred-thousand-dollar preference action brought against an

7  affiliate of Iconix, Artful Holdings, and we have submitted, I

8  hope Your Honor received -- otherwise, I can -- if I may

9  approach, Your Honor, with an initial proposed pretrial order

10  on this that would have discovery completed --

11          THE COURT:  Does everybody agree on this one?

12          MR. COGAN:  Yes, Your Honor.

13          THE COURT:  Okay.  Just hand it up.  Not to me.  Put

14  it over there.  When does it set a trial for this?

15          MR. KOEVARY:  Dis -- it doesn't -- using --

16          THE COURT:  When are dispositive motions?

17          MR. KOEVARY:  Dispositive motions by March 6th, 2015.

18          THE COURT:  Fine with me.

19          MR. KOEVARY:  Okay.  Thank you, Your Honor.  I think

20  with that, that brings us onto the summary judgment motions and

21  if I may go ahead and turn the lectern over to my colleague,

22  Kyle Bisceglie.

23          THE COURT:  We have cross-motions for summary

24  judgment, don't we?

25          MR. BISCEGLIE:  We do, Your Honor.

20

 1          THE COURT:  You want to flip a coin?  Who goes first?

 2          MR. BISCEGLIE:  I'm happy to go first and keep it

 3  short.

 4          MR. COGAN:  I would like to go first and we'll delve

 5  into the arguments.

 6          MR. BISCEGLIE:  Whatever Your Honor prefers, it's

 7  fine.  We're the plaintiff but whatever is the most efficient

 8  and helpful to the Court is fine by us.

 9          THE COURT:  Actually for once you guys agree on

10  something.  Seriously.

11          MR. BISCEGLIE:  Mr. Cogan is welcome to go first.

12          THE COURT:  Good.  Thank you.

13          MR. BISCEGLIE:  My partner is going to kick me when I

14  get back to -- I was told never to do that but...

15          MR. COGAN:  Thank you, Kyle.  I appreciate it.

16          MR. BISCEGLIE:  You're welcome.

17          THE COURT:  Go ahead.

18          MR. COGAN:  Thank you, Your Honor.

19          In spring 2009, the Laurita brothers, one of whom has

20  just been released who are the principals of Signature Apparel

21  Group recognized that they could not continue their license

22  with Studio --

23          THE COURT:  Just tell me who you represent.

24          MR. COGAN:  We represent Studio IP and Iconix.

25          THE COURT:  Okay.

1          MR. COGAN:  Studio IP is an affiliate of Iconix and

2    we were the -- Studio was the licensor of the license in issue.

3    Okay.  And again Signature had a license through Studio IP for

4    the sale of Rocawear branded junior sportswear apparel.

5          In spring 2009, the principals of Signature, the

6    Laurita brothers recognized that they could not continue their

7    license with Studio IP.  They were indebted to their factor,

8    CIT.  They couldn't pay their manufacturers for merchandise,

9    and they owed Studio IP about $7 million.

10          They told Iconix -- and I'll use Iconix and Studio IP

11    interchangeably.  They told Iconix that they could not continue

12    with a license and tried to find an investor or some other

13    transaction.  They tried for months and months and they failed.

14          In August 2009, Studio IP sent a notice of default to

15    Signature.  It said it would still work with Signature to see

16    if some deal could be done but it wanted to light that fire

17    under them to make sure a deal was done or that the license was

18    over as they told them.

19          Now, Signature had been in discussions with

20    individuals named Azrak, Ruby Azrak, Charles Azrak, about a

21    potential transaction, and before the cure period was over,

22    they requested a brief extension of the cure period under the

23    notice of default which Iconix granted.

24          During this period, Signature was represented by

25    Riker Danzig and they had also retained Ansell Grimm & Aaron

1  [sic] for advisory services.  Now, twenty-two minutes before

2  the expiration of the cure period on September 4, 2009, the

3  three Hong Kong manufacturers for Signature filed an

4  involuntary petition.  And global negotiations then ensued.

5          Michael Fox of the Olshan firm who was then

6  representing the petitioning creditors circulated a memo on

7  September 11 outlining the terms of a global settlement, and

8  that memo served as the basis for a resolution that was reached

9  by all the parties.

10         THE COURT:  So, on the date the involuntary was

11 filed, the license as a matter of law was or was not

12 terminated?

13         MR. COGAN:  It had not been terminated by a notice of

14 termination.  However, it had already been repudiated in the

15 sense that Iconix was told that the license would not continue.

16         THE COURT:  Again, do you believe as a matter of law

17 that the license between Iconix and Signature was terminated

18 prior to the filing of the involuntary?

19         MR. COGAN:  It had not been formally terminated at

20 that time.

21         THE COURT:  Okay.

22         MR. COGAN:  Now, what happened with these global

23 negotiations as suggested by Mr. Fox was a resolution was

24 reached whereby Signature gave up its license, a new license

25 was entered into with ROC Fashions, LLC which is an entity

formed by the Azrak family.  That new license provided for

significantly lower royalty rates and minimum sales

requirements, and ROC Fashions, the Azraks in turn paid the

petitioning creditors about two and a half million dollars for

all the merchandise they had on hand and agreed to continue to

buy from them.  That was the deal that was struck.

THE COURT:  Mr. Fox represented the petitioning

creditor --

MR. COGAN:  Correct.

THE COURT:  Who were suppliers.

MR. COGAN:  That's correct.

THE COURT:  He didn't represent Signature and he

didn't represent the licensor?

MR. COGAN:  That's correct.

THE COURT:  All right.

MR. COGAN:  And the parties contemplated a structured

dismissal of the bankruptcy proceeding which unfortunately did

not happen.  Now, years later, after the time for avoidance

actions under Section 549 have long passed and I point out Your

Honor as we cite cases in our brief that 549 is the exclusive

remedy to challenge a transaction like this.  The responsible

person claims that the transaction was a violation of the

automatic stay and claims that all of the involved parties and

their counsel -- remember, Riker Danzig was involved, Sills

Cummis was involved with respect to the --

24

1          THE COURT:  Which transaction was a violation?

2          MR. COGAN:  The termination -- the agreement to

3    terminate the license and to enter into a new and different

4    license with ROC Fashions.  So again what happened here was

5    Signature in the gap period agreed to give up the license and

6    in turn be relieved of further liabilities in the sense of they

7    knew this company was going down the tubes and ROC Fashions

8    entered into a new license.  Olshan's clients, the petitioning

9    creditors were paid two and a half millions, and they agreed to

10   supply ROC Fashions in the future as well.

11          And the claim years later is that the transaction

12   somehow was a violation of the automatic stay and this was a

13   huge conspiracy to defraud and that there was a

14   misrepresentation of the Signature license with false

15   representations --

16          THE COURT:  Was the two and a half million paid to

17   the petitioning creditor?

18          MR. COGAN:  Yes, it was.  By ROC Fashions.

19          THE COURT:  They're not defendants in this case, are

20   they?

21          MR. COGAN:  Well, that's curious.  We --

22          THE COURT:  Don't editorialize.  They're not

23   defendants --

24          MR. COGAN:  They are not defendants in this action.

25   No.

1          Your Honor, this claim of conspiracy could not be

2   further from the truth.  Everyone was well aware of the

3   license.  Iconix as I've said just now acknowledges that a

4   notice of termination had not been sent.  Obviously, Signature

5   knew that since they got the notices.  A memo from their

6   counsel at Riker Danzig discusses his review of the file and

7   notes that a notice of default had recently been sent --

8          THE COURT:  If Iconix had been asked by Signature to

9   modify the existing license, would they have done that?

10          MR. COGAN:  If -- I'm sorry

11          THE COURT:  If Iconix was asked by Signature Bank --

12          MR. COGAN:  It's Signature Apparel.

13          THE COURT:  By Signature Apparel rather than having

14   entering into a new license to amend the existing license and

15   move forward, would they have done that?

16          MR. COGAN:  No, they would not.  There was already a

17   situation where they had run the license down.  They weren't

18   able to --

19          THE COURT:  But yet they were willing to enter into a

20   new license with the same people.

21          MR. COGAN:  No.  They entered into a new license with

22   the Azrak family, a completely different group.  The Lauritas

23   were the principals of Signature.

24          THE COURT:  Right.

25          MR. COGAN:  The Azrak family were the principals of

26

1  ROC Fashions, LLC.  It was a new license with new people,

2  different terms.

3          THE COURT:  And the Lauritas had nothing to do with

4  the new licensing.

5          MR. COGAN:  The Lauritas had nothing to do with the

6  new licensing except there is a claim made that Christopher

7  Laurita received a consulting agreement from the new licensee,

8  ROC Fashions, but other --

9          THE COURT:  Which is an exclusive license.  You can't

10  have two people with the same license.

11          MR. COGAN:  That is correct.

12          THE COURT:  All right.

13          MR. COGAN:  Okay.  Now, there is no testimony or

14  document indicating that anyone from Iconix ever represented

15  that a notice of termination had been sent.  The claim here is

16  that we defrauded them by claiming that the license had been

17  terminated.  We never ever said that a notice of termination

18  had been sent.

19          THE COURT:  But if a notice of termination had not

20  been sent and it was an exclusive license, how did you give

21  another person a license?

22          MR. COGAN:  Because Signature agreed to give up the

23  license which they had the right to do under Section 303(f).

24          THE COURT:  So there's an agreement between Signature

25  and Iconix giving up the license?

1          MR. COGAN:  Exactly.

2          THE COURT:  Post-petition.

3          MR. COGAN:  Post-involuntary petition.

4          THE COURT:  All right.

5          MR. COGAN:  And post-involuntary petition --

6          THE COURT:  You don't argue the stay is not in place

7    on an --

8          MR. COGAN:  I'm not suggesting the stay is not in

9    place.  What I am suggesting, Your Honor, though is that under

10   Section 303(f) of the Code, disposal of assets during the

11   involuntary, during the gap period is perfectly permitted by

12   the debtor.  And, in this situation, that's what happened.  We

13   have a situation where Signature agreed to give up the license.

14         THE COURT:  But if the termination of a license post

15   -- we'll say petition rather than keep saying involuntary,

16   post-petition, was a violation of the stay then that would be

17   void.

18         MR. COGAN:  If Iconix had sent a notice of

19   termination that would have been problematic.

20         THE COURT:  But the tacit agreement to accept the

21   termination you say is different from actually sending an

22   agreement -- a letter?

23         MR. COGAN:  That's correct, Your Honor, because

24   303(f) specifically provides that you can have a disposal of

25   assets during the gap period even, the cases say, outside the

28

1  ordinary course of business.

2        THE COURT:  If those assets have value?

3        MR. COGAN:  Absolutely.  303(f) specifically provides

4  for that.  And the case law specifically provides for that,

5  that -- the concept is that if there is an involuntary filed,

6  the debtor is permitted to continue to operate the business as

7  --

8        THE COURT:  Does the asset have any value in your

9  mind?

10        MR. COGAN:  No.  And I'll get into that in a second -

11  - I'll jump to that right now.  Let me explain something about

12  this asset.  First of all, as a matter of law -- I mean, we'll

13  get to whether there was any misrepresentation.  I'll come back

14  to that and I'll address Your Honor's question.

15        First of all, as a matter of law, a trademark license

16  which is what this is, cannot be assigned without the

17  licensor's consent.  We cite <u>Colliers on Bankruptcy</u>.  We cite

18  Seventh Circuit cases, Southern District cases, what is called

19  the universal rule that a trademark license is in the nature of

20  a personal services contract, and therefore, even if it was

21  property of the estate, Signature could not assign it without

22  our consent.

23        But let's assume that they could assign it without

24  our consent.  Let me explain a few facts about this license and

25  this will be relevant to the <u>Daubert</u> motion as well.  This

1 license had fifteen months remaining on its term.  September

2 2009 is when the -- was when the involuntary was filed.

3 December 2010 is when the license expired.  It had no renewal

4 rights.  It had $7.4 million in default and its royalty rates

5 and minimum requirements were way above market and there's no

6 dispute about that.

7        So I ask you, Your Honor, what would have happened if

8 this was property of the estate.  What would have happened is

9 as a matter of law, the trademark license could not be

10 assigned.  What would have happened is that nobody in their

11 right mind would pay anything to obtain a trademark license

12 where they would have to satisfy the $7.4 million under Section

13 365 of the Code.

14        THE COURT:  Who would have -- who would they have had

15 to satisfy?

16        MR. COGAN:  They would have had to have satisfied

17 Iconix.

18        THE COURT:  Yet Iconix granted another company the

19 exact same license --

20        MR. COGAN:  Absolutely not.  Iconix did not grant the

21 exact same license.

22        THE COURT:  What did it grant?

23        MR. COGAN:  What they did was entered into a license

24 with somebody else who was in the industry and who had

25 capabilities and they gave a five-year license, an expanded

30

1  license with different terms, lower rates, different minimums

2  and the like.

3        They can't be forced to enter into a license with

4  anybody.  What would have happened -- assuming their arguments

5  that this was a violation of the automatic stay and, Your

6  Honor, during the gap period under Section 303(f), it was not a

7  violation of the automatic stay.  It was a disposal of assets

8  perfectly permitted but assuming that we now put this Signature

9  license back to -- as property of the estate, they couldn't

10  have done anything with it because a cure of the arrearages was

11  a necessary element of any assignment under Section 365 and

12  nobody was prepared to buy a fifteen-month term license at

13  above-market rates and cure 7.4 million at the same time.

14        So we have a situation where there was no fraud,

15  there was no misrepresentation --

16        THE COURT:  Well, is it your position that if

17  something is not assignable it's not assumable?

18        MR. COGAN:  That's correct.  Well, they could assume

19  it.  They could -- the -- Signature could have assumed the

20  license.  In other words, they could have elected to assume an

21  executory contract.  Yes, they could have elected but they

22  couldn't assign it.

23        THE COURT:  So even though it's not assignable, the

24  debtor could assume it to you.

25        MR. COGAN:  The debtor if it cured the defaults, it

31

1  could have elected to assume the executory contract provided it

2  cured the 7.4 million in default.

3          THE COURT:  All right.  I'm just wondering because

4  there's a split within the cases about whether if something is

5  not assignable it can even be assumed but...

6          MR. COGAN:  Now, Your Honor, I'd like to go back to

7  their allegations of fraud and so forth.  Again, their claim is

8  that Iconix and the Lauritas and everybody involved made a

9  misrepresentation that the license had been terminated.  Joseph

10  Schwartz of Riker Danzig --

11          THE COURT:  Let me just interrupt -- let's stay with

12  the summary judgment.  Fraud is never going to be in simplistic

13  world the subject of a summary judgment motion.  So the summary

14  judgment as I understand this which is a question of law is

15  you're taking the position that the license -- one was -- even

16  if it was an asset of the estate but during the gap period, the

17  debtor properly could basically terminate it.

18          MR. COGAN:  Agree to terminate it.

19          THE COURT:  Agree to terminate it.  The debtor did in

20  fact agree to terminate it and then you guys did whatever you

21  wanted to do.

22          MR. COGAN:  That's correct.

23          THE COURT:  So the issue is whether the debtor did in

24  fact agree to terminate the license.  That's really the sole

25  issue for summary judgment.  Everything else --

1    MR. COGAN:  No, it's not the sole issue for summary

2  judgment because even if there is a -- somehow an issue of fact

3  with respect to that which we don't believe there is, there

4  still is unequivocally no right to assign and no right and no

5  damages.

6    THE COURT:  No, but the debtor is not arguing --

7  well, I don't know what the debtor is arguing but if we both --

8  if you agree that the debtor could assume it, even though it's

9  not assignable because that's what you just said, then you

10 precluded the debtor from assuming it.  Whether anybody in his

11 "right mind" would have done it is a different issue but if the

12 debtor had a right to assume it and it was property of the

13 estate, then the debtor's argument is it's an asset of the

14 estate that was diverted from us.

15    MR. COGAN:  And what you have to do in that situation

16 if that argument is correct is value the asset.

17    THE COURT:  Which would be a question of fact.

18    MR. COGAN:  No.  It would be a question of fact if

19 the license A, could be -- they already said they couldn't make

20 a go of it.  They acknowledged that.  And I want to get what

21 their own attorney said.  Okay.  At deposition, their own

22 attorney, Signature's attorney said -- from Riker Danzig --

23 that he and his client concluded that it was financially

24 impossible for Signature to continue under the license, that

25 they had no legal right to assign it, and even if it could be

1  assigned, that any such assignment would have required the cure

2  of the 7.4-million-dollar default, and therefore, according to

3  counsel, Signature with advice of counsel went ahead and

4  decided to agree to give up the license.  There is no issue of

5  fact with respect to that.

6          In fact, Your Honor, I'd like to jump for a moment to

7  the Wagoner rule, the in pari delicto rule.  There is a claim

8  here of fraud, of breach of contract, all those types of things

9  but the rule under Wagoner is that if the debtor's principal

10 was -- had knowledge of the alleged unlawful conduct or

11 participated in the alleged unlawful conduct, that that

12 knowledge and those activities are imputed to the trustee or in

13 this situation the responsible person.  The responsible person

14 cannot come here and say well, I know that Signature

15 voluntarily --

16          THE COURT:  Is part of your summary judgment a

17 standing argument?

18          MR. COGAN:  Yes.

19          THE COURT:  So you're saying even though -- you're

20 saying Wagoner which is different from in pari delicto is a

21 standing the second --

22          MR. COGAN:  It's -- well, it's both.

23          THE COURT:  I've written a lot about this

24 unfortunately.  Normally, Wagoner is applied when you're

25 dealing with a professional, I think almost exclusively.  We

34

1   never found a case where it's not.  Now, the in pari delicto

2   question which is whether -- if they're alleging that you were

3   a coconspirator with them to defraud the company, that's an in

4   pari delicto argument.

5            MR. COGAN:  Correct.

6            THE COURT:  All right.

7            MR. COGAN:  And if the principals of the company were

8   engaged in that fraud or had knowledge of that fraud, then they

9   can't -- the responsible person/trustee cannot come back and

10  make claims about that when the principals of Signature

11  participated in that.  That's the Wagoner rule or the in pari

12  delicto rule.

13           So we raise that as an issue.  I'd like to point out

14  something, Your Honor, which is very --

15           THE COURT:  Just clarify that.  Your argument is that

16  the responsible person has no standing to bring this action.

17           MR. COGAN:  Has no standing because of --

18           THE COURT:  Right.

19           MR. COGAN:  -- Wagoner as well as the in pari delicto

20  defense.

21           THE COURT:  Right.  So it's a standing question.

22           MR. COGAN:  Correct.

23           THE COURT:  All right.

24           MR. COGAN:  Okay.  I'd like to point out what's very

25  interesting is a -- what they claim is the alleged fraudulent

35

1  statements that Iconix made to this Court.  Now, what they rely

2  on are not statements made by Iconix because despite huge

3  discovery in this case, numerous depositions, thousands and

4  thousands of documents, you will not see any document

5  whatsoever from Iconix stating that it terminated the license

6  by a notice of termination.

7          Instead, what you will see is an objection filed by

8  the Olshan firm when they represented the Creditors Committee.

9  And, at that time, what they said was -- and I want to quote it

10 --

11         THE COURT:  Your client -- let me just -- was it your

12 client that paid the Olshan firm's petitioning creditor

13 clients?

14         MR. COGAN:  No.

15         THE COURT:  Who paid them?

16         MR. COGAN:  ROC Fashions, the new licensee.

17         THE COURT:  And was that part of that overall

18 transaction?

19         MR. COGAN:  Yes.

20         THE COURT:  So ROC took a new license from you --

21         MR. COGAN:  Correct.

22         THE COURT:  And the creditors of Signature,

23 petitioning creditors got paid.

24         MR. COGAN:  That's correct.

25         THE COURT:  And that was orchestrated or represented

36

1 by Mr. Fox at the Olshan firm who was representing those

2 petitioning creditors.

3          MR. COGAN:  Correct.  Exactly.

4          THE COURT:  Okay.

5          MR. COGAN:  I had the same reaction.

6          THE COURT:  No, I don't have any reaction.

7          MR. COGAN:  Okay.  When Olshan represented the

8 Creditors Committee, it submitted various objections to various

9 motions, and in its description of the procedural history, it

10 wrote as follows:

11          "When it became clear that the debtor could no longer

12 perform its obligations under the Iconix licenses, the debtor

13 and Iconix agreed to terminate the license."

14          That is what they wrote.  That was the understanding

15 that the debtor and Iconix agreed to terminate the license.

16          THE COURT:  Who wrote that?

17          MR. COGAN:  That was written by Olshan firm --

18          THE COURT:  On behalf of the Creditors Committee.

19          MR. COGAN:  -- on behalf of the Creditors Committee.

20          THE COURT:  Not on behalf of the debtor.

21          MR. COGAN:  That is correct.

22          THE COURT:  All right.

23          MR. COGAN:  Okay.  But to the extent that there is a

24 claim here that the creditors were defrauded, that nobody knew

25 what was going on, that there was this big fraud, I think that

1  this statement speaks volumes.  Your Honor, you will not see

2  again a statement by Iconix that they terminated the license by

3  notice of termination.  There is an e-mail from Andrew Eckstein

4  of Blank Rome in which he says the licenses were terminated but

5  there is no statement whatsoever that it was done pre-petition,

6  post-petition, by notice, or whatever.  There is simply no

7  claim of -- no basis to claim misrepresentation.

8         They're also claiming, Your Honor, that the 2.5-

9  million-dollar consulting agreement that was entered into by

10  ROC Fashions, the new licensee, and Christopher Laurita's

11  entity New Star, that somehow this constituted a breach of

12  fiduciary duty which I will let Mr. Laurita's counsel address

13  but htey claim that Iconix aided and abetted that and that

14  they're guilty of aiding and abetting a breach of fiduciary

15  duty.

16         Again, you will not see one document whatsoever that

17  Iconix was involved in that consulting agreement.  What  they

18  write, what they rely upon is that in the months before the

19  involuntary was filed where there were some discussions about a

20  potential joint venture between Signature and ROC -- and the

21  Azrak family in some e-mails there was a discussion that the

22  Lauritas would be involved in that and might receive

23  commissions.

24         There is no testimony from anybody that Iconix was

25  aware of a 2.5-million-dollar consulting agreement.  What's

38

1  interesting is that when there was a settlement relatively

2  recently reached with the Azraks in which they agreed to pay

3  $400,000 to settle this eighteen-million-dollar claim, they

4  extracted an affidavit from Charles Azrak as a condition of the

5  settlement in which what Mr. Azrak said was that in the

6  negotiations the COO of Iconix suggested that -- for transition

7  purposes it would make sense for the -- for Christopher Laurita

8  to be involved in the company in the transition period.

9          That does not meet the legal standard of substantial

10  assistance of a breach of fiduciary duty.  So there is no

11  possible claim here that Iconix participated in any --

12          THE COURT:  But their argument is whatever Laurita

13  got, he had a fiduciary obligation to give to Signature,

14  whatever he got.

15          MR. COGAN:  But that's not problem.

16          THE COURT:  That may not be in --

17          MR. COGAN:  And, in order to establish that that --

18  you know, that's between them and the Lauritas, but you -- in

19  order to hold Iconix liable for that under a theory of aiding

20  and abetting a breach of fiduciary duty, you've got to show

21  that Iconic provided substantial assistance to this breach.

22  There is no testimony that we did.

23          All that we did at best according to an affidavit

24  that they got as part of a settlement, never testified to in

25  deposition what is we suggested that the Lauritas be part of a

1   transition, not that the Lauritas be given $2.5 million but in

2   the transition get the Lauritas involved.

3          Your Honor, I submit to you that we are entitled to

4   summary judgment, both factually and legally.  There is no

5   misrepresentation.  There is no involvement in a fraud.  There

6   is a right to agree to a termination of the license as they

7   said happened during the gap period under 303(f).  They can't

8   come in and make these claims under the <u>Wagoner</u> rule.  This is

9   simply a claim, Your Honor, years after the fact, after they

10  sued other people and were not successful.  When they tried to

11  bring in Iconix because they're the deep pocket and to try to

12  come up with a claim against them, Iconix did nothing wrong

13  here.

14         THE COURT:  Okay.

15         MR. PINCUS:  I may, I think I -- I just put in a

16  joinder to his papers.  I just want to be heard briefly on

17  that.

18         THE COURT:  Who do you represent?

19         MR. PINCUS:  I represent Chris Laurita and New Star.

20         THE COURT:  Are you going to tell me anything

21  different than he said?

22         MR. PINCUS:  I'm going to frame it a little

23  differently, Judge --

24         THE COURT:  Don't tell me the same thing I don't want

25  to hear.  If you've got something else, give it to me.

40

1          MR. PINCUS:  The only thing I want to frame it as,

2     Judge, is I don't think they can prove their claims because

3     it's all just an issue of proximate cause.  If you look at that

4     assignment issue, it becomes very simple in my mind.  In order

5     for them to win, they've got to prove that but for this

6     transaction, they would have realized all this income and I

7     think they cannot get there because there is an inability to

8     assign under the law.

9          THE COURT:  Why?

10          MR. PINCUS:  Because the contract is a personal

11     service contract.

12          THE COURT:  If the argument is that Christopher

13     Laurita had a fiduciary obligation to Signature and through his

14     conduct he diverted an asset that otherwise would have been a

15     value which is the argument to Signature, that's all I need.

16          MR. PINCUS:  Judge, there can't be a diversion unless

17     there's ability to realize value from the asset, and our

18     argument is here that --

19          THE COURT:  Well, if they stipulate it's valueless

20     then you're right.

21          MR. PINCUS:  No, I'm not talking about that.  I'm

22     stip -- what I'm looking for is a finding that it could not be

23     sold, the asset could not be transferred as a matter of law --

24          THE COURT:  Is it it's valueless or it could not be

25     sold?

41

1          MR. PINCUS:  Both.  Both.  Our position is both.

2          THE COURT:  You think it's -- if your argument is

3   it's valueless and they agree with that, it's relatively

4   simple.

5          MR. PINCUS:  Right.

6          THE COURT:  So we'll see.  If they agree that it was

7   valueless, then it's a simple case.

8          MR. PINCUS:  Right.  But I also want to stress that

9   there's an issue of law that it could not be sold as a matter

10  of law because it's a personal service contract and I think --

11          THE COURT:  Or it could be assumed.

12          MR. PINCUS:  It could be assumed but the debtor

13  didn't have the financial wherewithal to operate or --

14          THE COURT:  I don't have a record based on that, on a

15  summary judgment.

16          MR. PINCUS:  You're correct, Your Honor, but I think

17  their allegation is they would have been able to assign it

18  somewhere.  Their whole contention is the debtor would have

19  given it to the Azraks in a Chapter 11 case.

20          THE COURT:  Look, as you all know, there may be a

21  difference between what court can do after a complete record --

22  an evidentiary record is put together and what you can do on

23  summary judgment.

24          MR. PINCUS:  That's correct.  That's why I'm focusing

25  on the legal issue only, Judge.  As a matter of law, I don't

42

think that this asset could have been sold as a matter of law.

And therefore there could not -- there's no cause of action.

THE COURT:  Or it couldn't have been assumed, and if

it can be assumed, then you're dealing with what your

statement, that it was valueless or it doesn't matter whether

it was assumed or not.

MR. PINCUS:  Right, but I don't think that's their

contention.  Their contention is --

THE COURT:  Well, if they disagree with that, then

the question is was it of any value.

MR. PINCUS:  Thank you, Judge.

THE COURT:  All right.  You guys have anything to

say?

MR. BISCEGLIE:  Yes, Your Honor.

THE COURT:  Oh.  Sorry.

MR. BROWNSTEIN:  If I may --

THE COURT:  Sure.

MR. BROWNSTEIN:  -- I'm Mr. Cogan's partner.  I'd

like to address if I can on the bankruptcy level the issue of

the assumption and assignment.  Michael Brownstein from Blank

Rome for the Iconix defendants.

I think whether you take the actual or the

hypothetical test in respect of whether you can assume and

assign or not, I think the real issue from our perspective is

Iconix has the absolute right to preclude anyone from taking an

43

1  assignment of this asset, and that is what Mr. Cogan said

2  earlier so we would not have consented to an assignment.  So

3  the assumption is moot from my perspective whether they could

4  or they couldn't because some courts say that you can assume it

5  and some courts say if you can't assign it, you can't assume

6  it.

7         So I didn't delve into that because from my

8  perspective the critical aspect of it, it's you can't assign

9  the contract because we won't consent to it leaving aside the

10 factual issue as to whether they have the wherewithal to assume

11 it or not --

12        THE COURT:  But if the debtor's position is whether

13 or not they could have assumed it was taken out of their hands

14 by the actions of the parties.  As a matter of law, if you take

15 the position that since it could not be assigned they could not

16 assume it then it's irrelevant what anybody did.

17        MR. BROWNSTEIN:  And the point is I don't think the

18 law in the Second Circuit is clear.

19        THE COURT:  It's not.

20        MR. BROWNSTEIN:  I understand that but I looked at it

21 also from 303 under the Bankruptcy Code because from my

22 perspective there's clearly a tension between 303 and the

23 assumption and the assignment and if they had the right to

24 terminate this contract, then the issue is moot.  They

25 terminated this contract under 303.  That's clear.  There was a

44

1  new agreement entered into.  There was a new entity that came

2  in.  That new entity paid the pre-petition -- the petitioning

3  creditors.  They started operating with a new entity and the

4  debtor let it go.  There is no question that that's what

5  happened here, and from my perspective, 303 trumps that issue

6  and we're done.  It's really -- from my perspective, that's the

7  way I view it.

8          THE COURT:  Okay.  Thank you.  You're up.

9          MR. BISCEGLIE:  Thank you.  Your Honor, Kyle

10  Bisceglie from Olshan Frome Wolosky representing Signature

11  Apparel.

12          Let me start I guess with standing since it's a

13  matter of law.  The Wagoner rule which is a case from 1991 as

14  the Court well knows, I'm just shocked it's even being raised

15  in this case because all of the behavior that we're talking

16  about here is post-petition.  It all occurred post-petition,

17  and there is in fact a case that Judge Glenn wrote, In Re: Food

18  Management, which is a 2008 bankruptcy decision, a very lengthy

19  discussion involving very similar circumstances of whether the

20  Wagoner rule and in pari delicto which are two separate

21  defenses apply, and he concluded that they do no apply to post-

22  petition conduct.

23          We cited in our opposition brief, Iconix doesn't cite

24  it at all.  They simply keep harping on the Wagoner rule.  In

25  the --

1          THE COURT:  I thought their position with this was

2   there was a series of events that occurred including ones your

3   firm was involved with leading up to the filing of the

4   involuntary because I think Mr. Cogan said twenty minutes

5   before or something the filing of the involuntary there was an

6   agreement.  Somebody had to have those negotiations.

7          MR. BISCEGLIE:  We're suing on a post-petition

8   transfer that --

9          THE COURT:  So nothing that occurred -- you're not

10  arguing that anything anybody did prior to the filing of the

11  involuntary is at all relevant to this case.

12         MR. BISCEGLIE:  Not exactly, Your Honor.

13         THE COURT:  Relevant would be the wrong word.

14         MR. BISCEGLIE:  I'd say they're relevant facts --

15         THE COURT:  Right.

16         MR. BISCEGLIE:  -- however, the liability didn't

17  occur until there was --

18         THE COURT:  I'm saying as a matter of law the

19  divestiture or the termination of the license if it occurred

20  was all a series of transactions and agreements post-petition.

21         MR. BISCEGLIE:  Correct.  The post-petition transfer

22  occurred after the petition.

23         THE COURT:  And their 303 argument to you is?

24         MR. BISCEGLIE:  Completely absurd.  There is not a

25  single case that they cite nor is there a case in this great

nation where 303 has been held to relieve a debtor from the
effect of the automatic stay.

THE COURT:  I don't think anybody is arguing the
automatic stay is not in place on a post-involuntary.  They're
basically saying that the debtor in a gap period before the
order is entered has under 303 certain rights, and their
argument at least is that this transaction falls within the gap
period under 303, and therefore, there is no violation of the
automatic stay.

MR. BISCEGLIE:  Right.  Well, the problem with that
argument, Your Honor, is that they're effectively -- to have a
transaction, they would need to have terminated a license.
specifically the Signature license --

THE COURT:  Well, the termination is the event that
everybody is arguing about here.

MR. BISCEGLIE:  Sorry, Your Honor.  So on September
4th, there was an automatic stay.

THE COURT:  Right.

MR. BISCEGLIE:  Right?  As of that day, Mr. Cogan
admitted on the record that the license had not been formally
terminated, right?  In fact, what he didn't mention was --

THE COURT:  Why did your firm help negotiate a deal
post-petition?

MR. BISCEGLIE:  We did not.  A couple of things, Your
Honor.  First of all, this entire issue has already been

1    litigated and resulted in a decision -- a disqualification

2    decision that Judge Peck decided.  I mean, we spent six or

3    seven months working through all these issues.  I'm surprised

4    that we see them again but that's fine.  Just to be clear, pre-

5    petition we are representing factories that were creditors of

6    Signature.  What we didn't know was that the license hadn't

7    been terminated.

8            THE COURT:  So I'm just curious.  At the time you

9    represented the factories and orchestrated a payment from the

10   new licensee to your clients was post-petition.

11           MR. BISCEGLIE:  To be clear, I don't believe it's

12   true or relevant that --

13           THE COURT:   I'll -- let me figure out what's

14   relevant for the moment.

15           MR. BISCEGLIE:  Fair enough, Your Honor.  So I don't

16   believe it's a fair characterization to say we orchestrated a

17   payment.  I believe the goods needed to be shipped in order to

18   preserve the floor space for this license --

19           THE COURT:  However your clients received two and a

20   half million dollars, I assume there was some legal documents

21   drafted but I don't care.  The payment was made post-petition.

22   Is that right?

23           MR. BISCEGLIE:  I believe that's the case, Your

24   Honor.  I do not know.

25           THE COURT:  Let's assume for a moment it was because

48

1  everybody tells me it is.  If that payment was paid post-
2  petition --

3          MR. BISCEGLIE:  Right.

4          THE COURT:  And that's part of a transaction where
5  the party that paid your clients was taking the license that
6  was an exclusive license -- you couldn't have two people with
7  it -- did anybody look at whether in fact that transaction was
8  a violation of the automatic stay?

9          MR. BISCEGLIE:  We did not at that time.  We were
10  told that the license had been terminated according to its
11  terms.

12          THE COURT:  So if you knew then what you knew now you
13  would have told your clients they couldn't take the money.

14          MR. BISCEGLIE:  I'm not sure, Your Honor.  I mean,
15  I'm just entirely not sure simply because I'm not a bankruptcy
16  lawyer to say -- and I wasn't the deal lawyer involved and --

17          THE COURT:  Well, this is a highly technical case.
18  So I think you know enough -- hopefully you know enough
19  bankruptcy to get through it.

20          MR. BISCEGLIE:  Right.

21          THE COURT:  What's really in play on a summary
22  judgment as you know is solely issues of law.  Most of what we
23  deal with, it's very difficult to isolate law and fact because
24  it's the intent of the parties, this, that and the other.
25  Standing is easy -- it's not an easy decision but it's an easy

49

1  thing to understand.  And whether or not in my view all 500

2  pages that you all have given me is still down to the question

3  about whether the termination of the license had to occur which

4  was done post-petition was a violation of the stay or not.  The

5  fraud aspects and everything else feeds off that because if the

6  license could be terminated, then that takes us in one

7  direction.  If the license  was a -- if terminating it was a

8  violation of the stay, then the termination is void as a matter

9  of law.  That takes everybody in another direction.  It doesn't

10 mean you'll prove damages ultimately but it certainly takes us

11 in another direction.

12         So your view is that the license termination which

13 was never documented in a light -- in a termination notice to

14 my knowledge post-petition was a violation of the automatic

15 stay.  Is that correct?

16         MR. BISCEGLIE:  Yes, Your Honor.  Yeah.

17         THE COURT:  Does it matter whether the license had

18 any value for it to be a violation of the stay?

19         MR. BISCEGLIE:  Well, in terms of our ultimate

20 relief?

21         THE COURT:  I don't care about your ultimate relief.

22         MR. BISCEGLIE:  No.  I would say it would not.

23         THE COURT:  So, as a matter of law, the value of

24 something is irrelevant with regard to whether or not the

25 transfer of that was done in violation of the automatic stay.

1       MR. BISCEGLIE:  Correct.  And I would say -- I would

2  submit I find it hard to believe that the license that Rocawear

3  was given which was the same license that we had, slightly

4  different terms but for the same rights, and --

5       THE COURT:  But you have a motion -- you have cross-

6  motions here which I --

7       MR. BISCEGLIE:  Correct, Your Honor.

8       THE COURT:  -- really never understand but your

9  summary judgment is that their view -- because you have to

10  accept at least for purposes of pleading the facts it's a

11  worthless license.  That's their argument.  Had no value.

12  They're $7 million in the hole and they had an absolute right

13  to terminate it.  As a matter of law, you're saying they had no

14  right to terminate it, and therefore, whatever it's worth they

15  violated the stay and everything that flowed from that creates

16  these damages that you're suing for.  Is that --

17       MR. BISCEGLIE:  I'd say it's a fair characterization.

18  It's just a little generalized so if I could say --  it's true

19  pre-petition they had the right to terminate the agreement.

20       THE COURT:  All right.

21       MR. BISCEGLIE:  They did.  The agreement provided

22  they had to do a certain thing in order to terminate it which

23  is to provide written notice of termination.

24       THE COURT:  Pre or post, do you have a right to

25  assign it without their consent?

1          MR. BISCEGLIE:  Post, there is a provision in the

2   license agreement that would permit the assignment.  There is a

3   process that needs to be followed.

4          THE COURT:  So you're saying their argument that

5   there was no right of assignment is as a matter of law wrong.

6          MR. BISCEGLIE:  Well, I -- whether it is or isn't in

7   my view is not truly material to this motion because regardless

8   of whether they would have -- they claim that they wouldn't

9   have agreed to a new assignment, I find that hard to believe --

10         THE COURT:  I don't care what's hard to -- just

11  answer my question.  As a matter of law --

12         MR. BISCEGLIE:  They did assign it, Your Honor.  They

13  assigned it to ROC Fashions.

14         THE COURT:  Let me ask the question and then you can

15  answer it.

16         MR. BISCEGLIE:  Sure.

17         THE COURT:  As a matter of law, their position is

18  they -- you had, the debtor no right to assign the lease either

19  in bankruptcy or outside bankruptcy without their consent.  Do

20  you agree with that proposition?

21         MR. BISCEGLIE:  You know, Your Honor, I think -- I

22  can't answer that a simple yes or no.  I'd like to but -- if I

23  could but I can't.  I think what would have happened is there

24  may have been -- if we had -- the license hadn't been

25  terminated and the Court were made aware that the license

1  weren't terminated it would become part of the estate.  There

2  might be an attempt to fund a plan --

3          THE COURT:  I don't need an embellishment on a story.

4  All I'm asking as a matter of law a licensor, this licensor

5  takes the position that the license we're dealing with in this

6  case could not be assigned without their consent. Doesn't

7  require any greater factual presentation.  Do you agree with

8  that or disagree with that?

9          MR. BISCEGLIE:  I don't know, Your Honor.

10         THE COURT:  All right.  That's fine.  That's fine.

11  So, if it couldn't be assigned, do you believe it's assumable,

12  it could still be assumed?

13         MR. BISCEGLIE:  So, yes, Your Honor, I feel more

14  strongly that there is --

15         THE COURT:  As a matter of law, if the license is not

16  assignable under this circuit it's still potentially assumable.

17         MR. BISCEGLIE:   Yes.

18         THE COURT:  Okay.  You agree that the issue here is

19  not whether it made practical sense to assume it or not but

20  that the debtor was divested of an opportunity to assume it.

21         MR. BISCEGLIE:  Correct.  That I agree with.

22         THE COURT:  And isn't that the sole issue in summary

23  judgment that I'm dealing with?

24         MR. BISCEGLIE:  Correct.

25         THE COURT:  Their --

1          MR. BISCEGLIE:  Sorry.

2          THE COURT:  Their view is since it wasn't assignable

3   it had no value and even if it could be assumed it had no

4   value.  Now they go into standing on other things but we'll

5   leave that side.  Your view is regardless of its value, if it

6   was an asset of the debtor, they could -- it could not be

7   terminated without a court order.

8          MR. BISCEGLIE:  Correct, because of the automatic

9   stay.  That's right, Your Honor.

10          THE COURT:  Now, what about the argument that the

11   debtor's principals -- I think this is the argument as

12   buttressed by their deposition to the lawyers agreed to its

13   termination.

14          MR. BISCEGLIE:  There's no basis for that under New

15   York law.

16          THE COURT:  Well, as a matter of could they even have

17   done that --

18          MR. BISCEGLIE:  No --

19          THE COURT:  -- post-petition.

20          MR. BISCEGLIE:  Correct.  They could not have done

21   that.  Absolutely impossible.  There's a First Department case,

22   Perez v. Paramount [sic] that Iconix itself cites.  It's a

23   First Department case, 1996, and there's also the General

24   Obligations Law 15-301(4) that basically says if an agreement

25   provides that -- for written termination you need to provide

54

1  written termination, and that's the only way to terminate the

2  agreement.  These arguments about repudiation or, you know, a

3  tacit agreement among Signature principals and Iconix to

4  terminate the license, they're just -- they have no basis under

5  New York law.

6        THE COURT:  So is it your argument that upon the

7  filing of the involuntary the debtor-in-possession or the

8  trustee -- or trustee really appointed but were to have the

9  same rights as the "hypothetical lien creditor," and therefore,

10 the asset would be subject to that lien and could not be

11 transferred -- could not be disposed of?

12        MR. BISCEGLIE:  My short answer to that is I don't

13 know all of the rights of the hypothetical lien creditor but if

14 they had played by the rules I suppose there would have been a

15 process before the Court where Iconix agreed probably to

16 whittle down some of its claims.  Signature would have been

17 benefitted in some way perhaps by a reduction in claims against

18 the estate and maybe there would be an auction or some other

19 type of mechanism to maximize the value of the license but that

20 didn't happen because Iconix did not play by the rules.  They

21 chose for reasons that the --

22        THE COURT:  But the Lauritas who were running the

23 company you allege did it -- conspired to do this.

24        MR. BISCEGLIE:  Correct.  And --

25        THE COURT:  And you step into that company's shoes so

55

1 why aren't you liable -- why aren't you bound in a court of

2 equity -- I'm not sure what that means anymore but a court of

3 equity that the principal of the entity that you represent you

4 allege conspired with the people you're suing, and you're suing

5 the principal.

6            MR. BISCEGLIE:  Because --

7            THE COURT:  How aren't you bound by that?

8            MR. BISCEGLIE:  Because it's post -- we're suing for

9 post-petition acts.

10            THE COURT:  So all the Lauritas acts that you're

11 suing here were post-petition acts.  You're not suing them for

12 anything they did pre-petition.

13            MR. BISCEGLIE:  Again, what we're suing for is the

14 post-petition transaction and then the subsequent payments that

15 were made to Chris Laurita, $2.3 million in payments and the

16 payments --

17            THE COURT:  All post-petition payments.

18            MR. BISCEGLIE:  All post-petition.

19            THE COURT:  All right.

20            MR. BISCEGLIE:  So -- but clearly -- there were

21 clearly some predicate facts that occurred -- or discussions,

22 things that happened, demand to cure that was made, you know,

23 an e-mail that a general counsel of Iconix --

24            THE COURT:  But this all was put in motion three days

25 before the involuntary but -- you guys done?

1          UNIDENTIFIED:  Sorry.

2          THE COURT:  Okay.  If this was all put in motion

3   three days before the filing of the involuntary and finalized

4   so the transaction took place post, would the -- is your

5   argument the same that there's no -- the Lauritas had nothing

6   to -- I'm missing something here.  This entire battleship was

7   put in place and it moved forward on just the in pari delicto

8   argument.  The fact that it culminated post-petition takes it

9   out of in pari delicto -- it's not <u>Wagoner</u>.  It takes it out of

10  in pari delicto?

11         MR. BISCEGLIE:  Correct.

12         THE COURT:  All right.

13         MR. BISCEGLIE:  And again the case I would primarily

14  -- and is Judge Glenn's decision in <u>In Re: Food Management</u> and

15  then the decisions that he cites in there which to my knowledge

16  are the only relevant cases to circumstances like ours that

17  apply in pari delicto and <u>Wagoner</u>, and Iconix's papers really

18  all they do is they cite <u>Wagoner</u> and say you should apply

19  it but for whatever reason they don't touch on <u>In Re: Food</u>

20  <u>Management</u> which has a lot of parallels to this case.

21         THE COURT:  All right.  So just to sort of summarize

22  this, I'm being asked to decide as a matter of law whether the

23  termination/transfer/whatever else you want to throw in there

24  of this license that was owned or where Signature was the

25  licensee, where that license was terminated and Iconix became

1  the new licensee, that transaction on your part violated the

2  automatic stay, was void, and therefore, leads to a series of

3  damages, right?

4          MR. BISCEGLIE:  Yes.  And when --

5          THE COURT:  And the other side's position is that

6  that license, they had an absolute right to terminate, and

7  therefore, the termination is not void, in violation of 362,

8  and therefore, there can't be any damages.  I'm not sure

9  whether the two follow but that's their argument.

10         MR. BISCEGLIE:  Yes, except that their argument is

11 wrong as a matter of law on that point.  And that they've

12 admitted --

13         THE COURT:  You guys are wrong.

14         MR. BISCEGLIE:  Well, they've admitted the facts,

15 Your Honor, right, that there was -- New York law is very clear

16 that it requires written notice of termination before a stay

17 comes down.  I mean, I believe it's very clear.

18         THE COURT:  Then you'll win but they wrote hundreds

19 of pages; assuming they could read the same law, they don't

20 have the same view, and the question about whether or not you

21 can terminate by the actions of the parties or that the license

22 was valueless at the time and therefore could be abandoned in a

23 sense is their argument.  And value of it I think is a question

24 of fact, I can tell you right up front.  The issue here is not

25 the value.  The issue here is whether or not a license, and

58

1  licenses are the bane of most of our existence in the

2  Bankruptcy Courts but licenses, and this particular license

3  because it does deal with what this license is, whether through

4  circumstances at the time the debtor's petition was filed that

5  license was literally and figuratively terminated in which case

6  it was never property of the estate, in which case everything

7  implodes from it.  That's what I have to answer.

8         MR. BISCEGLIE:  I believe Your Honor is correct.

9  Both sets of counsel agree there are no disputed facts with

10  regard to termination --

11         THE COURT:  No, you don't agree on any facts but

12  you're close.

13         MR. BISCEGLIE:  I believe --

14         THE COURT:  What you agree on is there was a license,

15  it was terminated and that's about it.  That's about it.  Now,

16  all the rest of the stuff is not summary judgment issues.  Why

17  the Lauritas got money -- if in fact this license was never

18  property of the estate some serious questions about what

19  damages flow.

20         Now, you can argue there were still fiduciary

21  obligations and assumption of assets of the estate and all that

22  but I think the threshold question for me to answer is this

23  license, how it was terminated, and whether it was terminated

24  in violation of the stay, period.  The rest of it is subsequent

25  to that which I'm not going to answer today because I don't

1  know the answer but that's what I'm going to decide in the near

2  future that question and then we'll see where everything else

3  flows.  Daubert -- everything is a waste of time until I reach

4  the conclusion -- because if it's not -- period.  I don't have

5  to restate it.  That's how I'm doing this.  I don't need any

6  supplemental papers, thank you.  You're not encouraged to file

7  any supplemental papers.

8          MR. KOEVARY:  May I just say, Your Honor, one thing

9  to mirror my bankruptcy colleague across the aisle on

10 bankruptcy issues.  I just wanted to make a clarification.

11         Our view are twofold.  One is whatever 303 allows the

12 debtor to do, it does not allow for a violation of the

13 automatic stay.  That's one.  And number two is that a debtor

14 cannot consent --

15         THE COURT:  I don't think they're taking a position

16 that 303 is an absolution from the violation of the automatic

17 stay.

18         MR. KOEVARY:  Okay.

19         THE COURT:  They're saying it was never a violation

20 of the automatic stay.  That's their position.

21         MR. KOEVARY:  Fair enough.  And then just one more

22 clarification.  If it occurred post-petition, our view is that

23 a debtor cannot consent to the violation so Your Honor asked

24 the question over whether or not there was a termination, if

25 the Lauritas agreed to terminate, any violation -- any --

1         THE COURT:  Well, I guess part of the question though

2   is if the act of the licensor was predicated on agreements

3   entered into by the debtor pre-petition, did he have a right to

4   rely on them.  If the debtor had come to him two days before

5   the filing, it was an involuntary, and said we've got no shot

6   here, we're done, we're at $7 million, we're walking away.  Now

7   there's an involuntary filed.  Is it your position that that

8   licensor has no right as a matter of law to rely on anything

9   the debtor did pre-petition?

10        MR. KOEVARY:  They can't rely on it if relying on it

11  would mean violating the stay so what they could do is run into

12  court, file a motion to lift the automatic stay.

13        THE COURT:  All right.

14        MR. COGAN:  One thing -- actually two.  First of all,

15  the license specifically required any -- Iconix's consent to

16  any assignment.  So that's crystal clear.  Aside from the case

17  law that says a universal rule that a trademark requires a

18  licensor's consent.

19        The other thing that I just want to very briefly

20  address is the <u>Food Management Corp.</u> case which they cited for

21  the position that post-petition conduct is not subject to the

22  in pari delicto or <u>Wagoner</u> rule.  The <u>Food Management Corp.</u>

23  case involved misrepresentations that were done in the auction

24  process after the entry of an order for relief.  I think there

25  is a significant difference -- and there are no cases dealing

61

 1  with pre-entry of order relief because pre-entry of order

 2  relief --

 3          THE COURT:  But the problem is this is in this

 4  netherworld of prior to the entry of an order.

 5          MR. COGAN:  But since the debtor has the right to

 6  operate the business as he deems fit during the gap period, the

 7  in pari delicto/<u>Wagoner</u> rule has to apply to that conduct as

 8  opposed to post --

 9          THE COURT:  Not if the management of the debtor is

10  divested and is operated through a debtor-in-possession --

11          MR. COGAN:  That's not the case here.

12          THE COURT:  I understand that.

13          MR. COGAN:  And that's why I say I think the <u>Wagoner</u>

14  rule does apply to the knowledge.

15          THE COURT:  The clear -- the clarity offered by a

16  post-petition act unfortunately is lost when we're dealing in

17  this gap period.  There's lots of stuff that goes on in a gap

18  period that most of us can't figure out which is why we don't

19  like to have long gap periods.  The automatic stay does apply

20  but the same way people can negotiate deals in a gap period

21  without court approval, it's a question but it all goes down --

22  funnels down to the simple question, not a simple answer, a

23  simple question was the termination of this license as a matter

24  of law a violation of the stay.  My view is if you violate the

25  stay, any act is then void.  I found that with court orders of

1 district court judges and have been upheld on it.  So I don't

2 have any problem finding it's void if it's a violation of the

3 stay.

4        If it's not a violation of the stay, then it's

5 transferred and it's no longer property of the estate.  That's

6 what you guys have teed up.  I understand the question.

7        MR. SEIDMAN:  Judge, if I might, the way Mr. Pincus

8 and I had divided up the work allocation, he was going to argue

9 our joinder in Iconix's motion and I was going to argue our

10 opposition to the plaintiff's motion.  So if the two have

11 melded together, I have three or four brand new points that no

12 one has raised yet, a couple of which are --

13        THE COURT:  Sounds like one of those radio talk shows

14 for sports.  Let me raise a point that nobody has raised.

15        MR. SEIDMAN:  Nobody has raised, Judge.  I will not

16 repeat what's been said.

17        THE COURT:  You should trade for Calvin Johnson.

18 We'll give up a water bucket and bring in Calvin Johnson.

19     (Court and clerk confer.)

20        THE COURT:  Yeah, he will.

21        MR. SEIDMAN:  Mitchell Seidman from Seidman & Pincus

22 for Chris Laurita and the New Star Group.  And I'll be brief,

23 Your Honor, and I will not repeat things.

24        The first point is that pre-petition the Olshan firm

25 represented the factories.  Post-petition they represented the

1  Creditors Committee and Iconix was on the Creditors Committee.

2  I -- this is my first appearance in this case, and when I was

3  preparing for it, it just smacked me in the head how a lawyer

4  was suing their former client --

5          THE COURT:  Is any of this relevant to my summary

6  judgment?

7          MR. SEIDMAN:  Well, it might be, Your Honor.  It's

8  certainly going to be relevant to the trial --

9          THE COURT:  Only if the answer is it is do I want to

10 hear it.

11         MR. SEIDMAN:  I certainly think it's relevant for the

12 trial and --

13         THE COURT:  I'm not interested in the trial.

14         MR. SEIDMAN:  Okay.

15         THE COURT:  All I'm dealing with is a motion for

16 summary judgment.

17         MR. SEIDMAN:  All right.  On the summary judgment,

18 Your Honor, on the stay violation issue, I do not believe that

19 an entity can recover damages for a stay violation.  I believe

20 the most the entity gets is a contempt hearing and I think that

21 that is relevant for the summary judgment motion.  I believe

22 there's case law on it.  We've cited --

23         THE COURT:  So if there's a violation of the

24 automatic stay and there are damages --

25         MR. SEIDMAN:  If there is.  If there is.

1        THE COURT:  If there's a violation of the automatic

2   stay and there are consequences of that, nobody has to pay it?

3        MR. SEIDMAN:  There's different consequences, Your

4   Honor.  I believe they get a contempt hearing.  I don't believe

5   they get damages.

6        MR. COGAN:  If I may, Your Honor, there are ten

7   causes of action; not one of them is for violation of the

8   automatic stay.

9        MR. SEIDMAN:  Which is my next point, Your Honor,

10  that this action is essentially an end-run of a proceeding for

11  violating the stay and of a 549 avoidance claim which would be

12  barred by the two-year statute of limitations.

13       This action is essentially an avoidance action or in

14  lieu of an avoidance action or in lieu of a motion for a

15  violation of the stay the avoidance claim would be barred by

16  the statute of limitations and there was never a motion made

17  for a stay violation since this litigation was started.  I do

18  think that's relevant to the summary judgment motion.

19       The other thing as a matter of law, Judge, for the

20  summary judgment motion statute of limitations, the tortious

21  interference claim has a three-year statute of limitations and

22  this claim, the tortious interference claim was brought more

23  than three years after the September 15, 2009 termination of

24  the license or transfer of the rights.

25       So I think there's an issue of law there on the

65

 1  three-year statute of limitations on the tortious interference

 2  claim and I think there's an issue of law there on the

 3  plaintiff end-running an avoidance claim because it's barred by

 4  the statute of limitations and end-running a motion for a stay

 5  violation that they never brought.

 6       THE COURT:  Okay.  Anybody else?  All right.  Here's

 7  what we're going to do.  This trial is scheduled to start next

 8  week.  Is that right?  And you all say it's going to last weeks

 9  which means if I start it, I would have to continue it after my

10  life here, and that's one of the things I have to talk to some

11  folks about because there's going to be new judges in here

12  probably January and I get to go home.

13       Now I can also -- since I'm familiar with it start it

14  and keep it.  I mean, I'd try it but we've got to figure out

15  and I'll let you know plenty of time -- I'm not going to

16  prepare for a trial that I'm not going to have.  So -- but the

17  summary judgment I'll be doing.  I'll give you a decision on

18  that.

19       So I'm going to get to Judge Morris and ask Judge

20  Preska because also is involved what they would like me to do

21  and then we'll get to you as quickly as possible.

22       MR. SEIDMAN:  Judge, if we're on housekeeping, I have

23  one issue with respect to the trial date.  Since we made an

24  earlier application for an adjournment based on the fact that

25  our firm was new, since that time, I've been reached for trial

1  and I am in the middle of a three-week jury trial and the only

2  reason I'm not there today is because it's Election Day and

3  state courts in New Jersey are closed.

4          I've asked for permission from the state court judge

5  to be excused to be here on the 12th and 13th and being aware

6  of the supremacy clause, he has not answered me yet.  So -- but

7  we're not supposed to finish --

8          THE COURT:  State Supreme in Manhattan?

9          MR. SEIDMAN:  No, no.  The state court in New Jersey,

10 Your Honor, in Bergen --

11         THE COURT:  Oh, then he's not going to --

12         MR. SEIDMAN:  But I'm duty bound on behalf of both of

13 my clients to make the request.

14         THE COURT:  Okay.  In all -- that will not be

15 sufficient.  I mean, I respect the fact that -- but somebody in

16 your firm will have to carry the -- for the first couple of

17 days if we go ahead.  This has been going on for years and so

18 you all took the case and that's fine with me.  I think you're

19 good lawyers but you take it as it stands.  So we'll figure it

20 out but again I'm going to get an answer to you guys within the

21 next forty-eight hours, and I'm not sure what my preference is

22 but I want to see what -- again, Judge Morris and others want

23 to happen.  If it's turned over to -- if it does go -- if I

24 rule on the summary judgment and then it's picked up by a new

25 judge, that judge can try it and it will start at zero which

1  may be the right answer.  It's just unfortunate but that's

2  life.

3           MR. COGAN:  To some extent, we're going into a trial

4  without knowing exactly what issues are in the case or might

5  not be in the case.  I don't mean to impose --

6           THE COURT:  I agree with that.

7           MR. COGAN:  -- more work on the Court but doesn't it

8  make sense to have the motion for summary judgment decided

9  before we have the trial?

10          THE COURT:  Yes.  And if I can't decide it before,

11  then that decision on the trial is easy.  The question is

12  whether I can decide this on this issue between now and next

13  week.

14          MR. COGAN:  The concern that I think we all have is

15  what are the exhibits, who are the witnesses.  You know, we

16  don't know which causes of action -- you know, the whole case

17  may be thrown out hopefully.  There might be only two causes of

18  action that remain.  I mean, I --

19          THE COURT:  Okay.

20          MR. COGAN:  I think it's fair --

21          THE COURT:  Here's what the right thing to do.  We're

22  not going to have the trial.  I'll adjourn the trial.  I'm

23  going to finish the summary judgment and then you all will pick

24  this up with another judge for trial assuming there is a trial.

25  I think that -- as much as I dislike adjourning things, I'm not

68

1  going to force -- shoehorn you guys into my schedule.  That's

2  just not right.  So --

3          MR. COGAN:  I mean, I don't mind continuing the trial

4  with Your Honor after the motion for summary judgment is

5  decided so that way we know what the case is about.  You know,

6  what the -- and I would stipulate, you know, to Your Honor

7  continuing whether it's after January or --

8          THE COURT:  Big of you.

9          MR. COGAN:  I know you love this case.

10          THE COURT:  This is not an interview where I want

11  something.  I'm not trying to get business.  This is the Second

12  Circuit deciding they like me too much or don't like me, I'm

13  not sure which answer is right but no, they will permit me to

14  stay here.  Again, let me talk to Judge Morris.  She's the

15  Chief -- as you know, Chief Judge in the Southern District.  I

16  have more than enough, Mr. Klestadt knows on my plate out in

17  the Southern -- wherever I am, CI.  So -- but I do understand

18  that we've spent a lot of times.  I know the issues, I know the

19  lawyers.  I'll get you an answer but the trial -- we're not

20  having it next week so you don't have to prepare for that, and

21  I'm going to get you the summary judgment decision as quickly

22  as possible and then we'll see where we go.

23          All right?

24          MR. COGAN:  Thank you, Your Honor.

25          THE COURT:  Thank you all.

1       MR. KOEVARY:  Thank you, Your Honor.

2    (Concluded at 2:56 p.m.)

3                    * * * * *

4

5

6

7

8

9              **C E R T I F I C A T I O N**

10      I certify that the foregoing is a correct transcript

11   from the electronic sound recording of the proceedings in the

12   above-entitled matter.

13

14

15

16   *Kathleen M. Price*_____   DATE:  November 12, 2014

17   Kathleen Price, AAERT Cert. No. 325

18   Certified Court Transcriptionist

19   AD HOC TRANSCRIPTION, LLC

20

21

22

23

24

25